Good morning, Your Honors. May it please the Court, my name is Rob Bonta, Deputy City Attorney with the San Francisco City Attorney's Office. I represent the Defendant and Appellant, the San Francisco Sheriff, Michael Hennessey, in this matter. Also at council table with me are Deputy City Attorney Danny Hsu and Attorney David Newdorf. I'd like to reserve 10 minutes for rebuttal, please. Whatever you have left on the clock will be yours. Thank you. Your Honors, this is a case about important jail safety and security needs. First, under this circuit's law, based on the City's stark evidentiary record of drug and weapon smuggling, a record that's never been seen before in this circuit, the Court should find that the San Francisco Sheriff Department's former strip search policy is constitutional. Second, under the balancing test set forth in Bell v. Wolfish, when faithfully and authentically applied, the San Francisco County Jail's significant safety and security needs are constitutionally justified. Let me ask you a couple of factual questions, just to make sure I have straight in my mind what the record is here. Somebody gets booked for some offense which isn't one that gets released like a traffic citation. It is one where you do or you do not? Do not. Okay. So they get hauled down to jail, and then if they have to spend the night, they have to go through this procedure. And when they spend the night, they get put in with the general jail population. Is that right? So that means not simply people who are like and charged with an offense, but also people who are there serving time, right? Generally, Your Honor has it right. For a number of different crimes in California, you can be cited and released in the field for many misdemeanors, for many infractions. If you can't provide a positive form of ID in the field or for other reasons, if it's a continuing offense, if you need medical care or you need to sober up, if you refuse to sign the promise to appear, you will be brought to County Jail 9, the county jail's intake facility. There, after you're positively ID'd, you could still be cited and released. Again, under California law, for all misdemeanors, you're eligible with a few exceptions. You can also post bail. So there are a number of off-ramps, so to speak, for which you will never be joining the general jail population. Let me stop you there for just a second just to make sure I'm following. Let's say you are arrested at 3 in the morning or, you know, pick your time of the day or evening or the weekend, and you say you can post bail. Who sets the bail? Is there always an opportunity to take the bail off-ramp, or is it – doesn't somebody have to make a bail determination – explain to me how – There's a bail schedule. It's set. There's a list of crimes listed by penal code, traffic code, health and safety code. If they're for felonies, there's a set bail amount. If you can meet that amount, you are out on bail. There's no discretion left to the Sheriff's Department. They just follow the bail schedule. The bail schedule is predetermined by a panel of judges each year. I have another factual question, and that has to do with the way in which the members of the defined class arrive at the jail. Let's say it's one of the traffic offenses or public nuisance or one of the remaining things after the folks that can be strip searched that were not in the class. Are they taken directly to the facility? In other words, they're picked up in the park because they're loud. And are they taken directly there, or do they go home and pick up their stuff? In other words, is there some additional opportunity for them to obtain something dangerous or something contraband, or are they taken directly to the jail? I'll try to answer your question in two ways. Generally, if it's an on-view arrest, they are arrested. There's an attempt to cite and release them, if possible, then taken to county jail. There are a number of them. But they're taken directly there. They're not taken home first or to their friend's house or whatever. If it's an arrest in the field, for an on-view, usually, yes. Sometimes they could have noticed that there's a warrant out for them, and they could turn themselves in. They could surrender. That's possible. So there's no one grabbing them and bringing them right in. Counsel, you seem to be minimizing the whole notion of who is actually going to be subject to the body cavity search. Let's just be frank. We're talking about some people. Maybe people are arrested for underage drinking or for making a nuisance in the park. And they are taken. Those people who are arrested are taken directly to the jail. And under the former policy, it's uniform, regardless of the nature of the crime or anything else, that they would be subject to the highly intrusive body cavity search. I'm not trying to minimize it. I'm just trying to be accurate about who gets there. Well, answer my question, yes or no. Yes or no. That is the answer to my question. In those cases, if they're misdemeanors, usually no. They never get to the strip search stage, which is why we believe it's important. Are you sure of that? What if they can't? If it's a misdemeanor... What if it's a misdemeanor and they're taken in to the jail, say, to sober up, as you said earlier? Yes. Then are they subject to the blanket policy or not? No, they're not. A released one sober is never booked in. They are released one sober after four hours. Where are they held? In a tank in County Jail 9 for four hours until they're sober. Why is there no possibility that other people whose, the nature of their crime doesn't fit into one of the well-defined categories in our long-existing precedent, such as violence or major drug offense, why can't they be held in a cell similar to Number 9 and not intermingled with the general population? Because for a number of reasons. County Jail 9 is an intake facility. It is the beginning, the gateway, so to speak, of the rest of the post-arrest criminal justice system in San Francisco. It's a place where you're triaged medically to get your medical needs set. It's determined if you'll be housed or not. You get a classification. You need to be in and out in 24 hours. There's no beds there. You can't be housed. It is true, as I understand it, that these people are, have not been arraigned. The group that we're talking about, the class, has never gone before any judicial person to determine whether there's probable cause to keep them. And that's going to happen within a matter of a day or two. It's a pre-arraignment class, and usually the arraignment is within 48 hours unless there's a holiday or a weekend. And is there, and the practice is to take those people and put them in with the general population as opposed to segregate the people who haven't ever seen a traditional officer and who haven't been determined not only not to be, not only are they pretrial, but they're pre-arraignment. It has not been determined that they are, there is even probable cause to keep them. You're right. These people have not seen a judicial officer determine the charges that we brought against them. There is an arrest, which is based on probable cause. Well, it is a rest of probable cause by the judgment of a police officer, but not by the judgment of a judicial officer. That's correct. Unless they get picked up on a warrant. There's exceptions to that rule. Right. But let me ask you a question. Is there anything in this record about who is eligible for citation and release? I believe it's in the record. If it's not, I think you can take judicial notice of Penal Code 853.6i. Is there anything in this record that tells us what the bail schedule is? I don't think so. So at this point, the district court did not know unless it took judicial notice of who could be cited and released and who could and how much bail they could take? It would be difficult for me to believe the district court did not know that. That was fully briefed by both sides and an issue that we really brought up. I look very carefully to try to find if those were in the record. So that's why I ask you. I believe that we have represented and both sides, I don't think it's contested or disputed that Penal Code 853.6i allows for eligibility for all misdemeanors and infractions to be cited out. Counsel, you said earlier that there was evidence of smuggling. Were the smuggled items linked to the particular plaintiff class in this case? The short answer to your question is yes. And the second part of my answer is even if it weren't, based on the evidence in this case, the district court's policy at issue would still be constitutional. Would you expound on how the smuggling evidence was linked to the class of plaintiffs in this case? I can't. I don't know if you all have the excerpts of record, but excerpts of record 609 is an example of a class member in this case. This is an individual who was brought in to Is this volume three? Yes. You probably just have the page. That's fine. It is volume three. I'm sorry, go ahead. So, Your Honor, this is a person who was arrested on a warrant for burglary. That's a felony of poverty crime. Fully within this class, non-drugs, weapons of violence crime. That this person would have been subjected to a metal detector wand search and a pat search shortly upon coming to the intake, San Francisco County's intake facility. And this person would have been checked, their charges would have been checked and their history would have been checked to determine if they are strip search eligible at that point. This person was not. And that's indicated in this document. And also by their charges, which are non-drugs, weapons of violence charges. And there was no past record that would have disqualified them from class membership because that's also part of the definition? Yes. Well, part of the – it's not part of the class definition, but it's part of what happened to this person. Technically, just so Your Honors are all aware, there is no definition in the certified class definition. There's no requirement that the person not have a history of drugs, weapons of violence. But the district judge so held and this hasn't been challenged, right? The district judge essentially narrowed the class by saying that. Excluded any arrestee with one or more prior convictions. We want some judgment on that. That's correct. Okay. So that's a liability issue, but not a class definition issue. I think there's a distinction. But it's not an appeal. And for our purposes, the class that we're concerned about does not include. I think for your purposes, if there's a class member and they do have a drugs, weapons of violence history, you can assume that that person was justifiably strip searched under the law. And that isn't an issue in this case at this point, whether that person can validly be strip searched or could have been. I don't think that's an issue at this point. So the person that you're giving us an example for, 609, were they subject to one or more prior convictions or two or more prior arrests for any crime involving drugs, weapons or violence? They were not. Okay. And if they were, the box on that page that says strip search, parentheses, drugs, weapons, violence, et cetera, would have been checked. It wasn't. You know, I'm sorry. The box that was checked is the criminal strip search box. I've gotten lost completely as to this individual. You started telling us a story about what happened and I got lost. Okay. Why don't you try again? Okay. But do it sort of quickly. The person comes into county jail number nine, our intake facility. He gets a wand search for metal, gets a pat search. Nothing is found. This person is run for criminal history, found to have no history of drugs, weapons or violence. His charges are not for drugs, weapons or violence. He can't be strip searched at this point. He can bail out. He can – I don't think he can side out. It's a felony. But he can bail out. If he doesn't make bail, he's going to be housed. We wait until that point, but at the point when he changes his civilian clothes into an orange prison uniform and he's going to be housed, we will strip search him. And he was. So who's the subject? This is because at that point you take him to the – and commingle him with the general prison population, right? That's right. Which includes folks who are serving time. Yes. It could include that. He leaves the intake facility. I'm just asking a factual question. At that point, you put him away from the intake facility. The intake facility has only people who have been arrested and charged with a crime. Whereas in the prison population as a whole, where you take him in the orange suit, you have people who are there serving 16-day sentences or six-month sentences. Those are part of that general population. It also includes people who are still pre-arraignment, like this person, for example. He will be housed in county jail until his arraignment. So there are some who are still pre-arraignment. There are some that are pre-trial. There are some that are post-trial. And at that point, they do a strip search on him and find the scissors. The eight-inch scissors. That's right. Can you tell us where the scissors were found? Well, because they weren't found by a WAN search or a PAT search, and they were only found during a strip search, the only reasonable inference is that it was in a bodily orifice or somewhere that was only findable by a strip search. This document does not specify where on his body was found. Or you had a WAN that was set wrong or a PAT down search that was ineffective or something of that sort. That is also possible. But we don't know as a fact where this pair of scissors was. There's nothing that indicates the part of his physical anatomy where it was found. Right. Okay. Let me ask you another question. Where is there in the evidence in this record how each of these searches are done? Captain Arata's deposition is a good source for that. Okay. So he, if I read his testimony, then his particular testimony would tell me about how these searches were done in general? Yes. Specifically, it's at excerpts of record 94 to 98. Okay. And in comparison to Justice Marshall's recitation in the searches of Bell, would you say they compare? They're not significantly dissimilar. I'm sorry, I didn't hear your answer. They're not significantly dissimilar. They are both visual strip searches. And just so you know, I mean, this is a, it's an It's one-on-one on the same site. There's no contact. Okay. I just, I don't quite know how to phrase this question delicately. But let's say they see something suspicious at that point. What happens? At which point? Where they do the body cavity inspection and they believe there might be something concealed? In most cases, they will verbally notify the arrestee that they see something and ask for it to be provided to them. What if it's not? They could be, it could be taken from them. So there's touching at that point, right? I'm sorry? There's touching at that point. If the person being searched doesn't voluntarily give up the contraband and it's taken. So that's touching at that point. If it doesn't, if it's not revealed or fall out or not takeable, you can take it. Many items without touching the other person's body. There's some things that are in people's bras, in their underwear. But if you get to the point where something is inside somebody's body and they're not giving it over, I think usually on this record they would be taken to a safety cell. There's such a thing as a safety cell. That was my question. So what happens at that point, they get put someplace safe. And then I gather, I'm just speculating here, but I gather further guidance is sought as to how to deal with them at that point. Right. Additional measures would be taken. We've been talking a lot of facts, but it would be helpful for you to tell me what you think the ultimate legal rule that comes out of Bell v. Woolfish that applies here is. Right. The ultimate legal rule of Bell v. Woolfish is that in a jail setting where jail safety and security needs are paramount, a balancing test, a balancing approach is taken. It's a special needs setting, and that's been acknowledged by the Supreme Court Skinner case, where suspicionless searches are constitutional under the Fourth Amendment. And the approach is a balancing test. So on one end, you measure the jail security and safety needs and keeping out weapons and drugs from being smuggled into the jail and preventing the injury and even death, as we have in this record, that can occur. On the other hand, you balance the invasiveness of the search. And when that test is faithfully and authentically applied, as it should be, because the Supreme Court has announced that rule, on this record, with the significant contraband record that we have and the nexus that we have to this class, and all the findings of drugs and contraband in this case. Is it of any relevance to that standard, A, that this is prearrangement, and, B, that the decision to be made that the decision to put them in the general population is not an inevitable one? It's what you've decided to do, but it doesn't seem inevitable. It seems like there are alternatives to that. Let me answer your question in two ways, Your Honor. I think your first question was the difference between prearrangement. Well, they're obviously related. Because it's prearrangement, we're talking about a very short period, and we're talking about people, I would think, with more stronger interest in not being treated as having done something wrong, because they're two steps away from that. Well, Your Honor, the Bell v. Warfish test applied a Fourth Amendment test. It didn't apply a Fourteenth Amendment test. It didn't apply an Eighth Amendment test. The Fourth Amendment test was based on the jail safety and security needs. Those do not differ, whether you're prearrangement or pretrial. In fact, in Bell, they stated that there's no different jail security and safety needs when you, between pretrial and convicted inmates. So there shouldn't be a distinction. The Fourth Amendment provides the highest level of protection. Unless you simply did not take people and put them, at least a subclass of people. Right. And put them in the general population until they at least receive a judicial office. Right. But that, Your Honor, becomes very problematic, both legally and factually. Legally, that would be failing to give jail administrators, when crafting policies to protect the safety and security of the inmates, of staff, of the public, failing to give them the deference that they're owed under the law. And they're owed that deference because of their expertise in the area in which they work, and also because of the separation of powers. It's a legislative and executive decision. In addition, that would be engaging in what has been prohibited by the case law. Least alternative, least restrictive alternative analysis. It only needs to be reasonable. It's inherent in a balancing test, isn't it? Not a least restrictive alternative, but a less restrictive alternative consideration. The test is, on the balancing test, do they have a reasonable policy? Many people, and this has been stated in the case law, that it would create insuperable barriers to searches and seizures if judges or others at a later time could opine about what would be a better or different policy. As long as it's reasonable, it passes constitutional muster. And I just want to get out one last thing. Why is it reasonable to commingle presumptively innocent suspects with people who have been convicted of crime? Why is it what? Why is it presumptively reasonable, in your view, to commingle innocent people, people who have not been adjudicated to be guilty, and house them with people who have been convicted of crime? Why shouldn't the city have separate facilities for presumptively innocent people and guilty people, since there are security concerns? Right. Well, it's a resource allocation issue. It's an issue that's been put squarely in the province of jail administrators. Where you are on your criminal process doesn't determine where you should be housed. But there is a limit. If you have a vulnerable suspect, we've had cases with vulnerable suspects, and it doesn't matter how much it costs, you can't put them someplace where they're going to get beaten up or raped or whatever. We have cases like that. So there is a limit to the resource allocation argument. Now, we do know that you don't do the strip search in the tank, right? No. That's correct. So there you have presumptively innocent people housed with other presumptively innocent people, and they're spending as much as a day there, or half a day? Yes. 24 hours is the limit, Your Honor. I'm sorry? 24 hours is the limit. 24 hours, often in the same cell. It's a tank. It's a tank. It's shared. There could be other individuals there. There's different size tanks, but yes, it's a tank. And if one of them had a pair of scissors or a knife or a razor blade concealed in their socks or underwear or something like that, people could get hurt. And yet, the city takes that risk. And is there any evidence as to what happens in the tank, as to where people have not been strip searched? Is there a huge incidence or a significant incidence of people being hurt or killed or whatever? There is evidence in this record that on booking searches, when some people come in before they ever get to the classification search, if they're eligible to be searched, that they've found items on some of those people. Right, but the definition, those are not items that can be used while they're in the tank. So we know that booking searches are sufficient to get those things out. You don't need a strip search. So what I'm interested in now is the interval after the booking search and before they are put into the general population. How much evidence is there or what evidence is there as to the danger, what happens during that period? Because at that point, you have just... Right, right. That gets to exactly why we believe it's important to strip search people before they get housed, because they are intermingling. There could be an exchange of contraband, weapons, drugs that could get into the jail. But Judge Kaczynski's point is that the way your current system, as I understand it, is that some people are strip searched at booking who are in the categories that are not in this class. But the people in this class are not strip searched while they're in the tank in jail 9. Right? They're not strip searched until they leave that tank and are being transported to the general population. So the question is, is there any evidence of the people who are not strip searched at booking while they're in the so-called tank at jail 9, having contraband or using it or anything like that? There's some evidence of that. For example, at record 574, which we think is a good example of the deterrent effect of our policy, there was, I think it's a green leafy substance that was left in the lavatory in one of the tanks. Likely because the person knew that they would be strip searched, they were deterred from bringing the drugs into the general jail population and left the drugs in the lavatory in the tank. I need to yield the rest of my time. Thank you. Okay. Thank you. We'll hear from the other side. No. Okay. Plaintiff. Mr. Seaton is front. I'm sorry. Let's make sure. Was there somebody else on that side that wanted to speak? In rebuttal. In rebuttal. Okay. I'm sorry. I didn't mean to cut off anyone. And why don't we turn the clock back to 30? I can send it up to counsel. There we go. Please start again. Thank you, Your Honor. I was just going to indicate that Mr. Schwartz is in trial. Otherwise, he would be assisting me this morning. I think, although I have lots of notes, I'd rather address some of the questions that have been raised. The first point is that at no stage of the examination of this record by the judges who have looked at it so far, excluding Your Honors, has any instance of any member of this class been found to be concealing contraband? Well, isn't that your burden of proof? And I think we've discharged that, Your Honor. Well, isn't this summary judgment? Yes. Didn't you win on summary judgment? Yes. And therefore, if I were to look at the facts in this record, and I were to suggest that one member of this class might meet those particular facts, and I was to give every inference to them that's San Francisco, what did you present contrary to those inferences? Well, there is no individual indication or instance. And we'll look specifically at 609, which is the... Well, what I'm looking at is I look at Bell, and it seems to me that in that particular situation, you have to show that the justification by San Francisco was somehow extreme or somehow exaggerated. And on this record, it seems to me you then have to have come forward, especially on summary judgment, and present some facts which would suggest it. And we have two instances in this record which have been put together by San Francisco, where if I give him the inferences of the record, it would survive summary judgment. That's not true, Your Honor. I beg to differ. First of all, the instance of 609 is not a strip search of a member of this class. First of all, it happened after the policy changed. Second of all, it clearly is a scissors, which we have no evidence that that was in any kind of orifice. Well, but just a minute. The fact about no evidence or whatever evidence, if in fact, as I understand Bell, that San Francisco County comes forward with a genuine policy that is based on evidence that they have, and they've presented much evidence, and they come forward with people in that class suggesting they are a part of the evidence, then it's your duty to come forward with something to contradict it. Or I have to send back for a summary judgment, I have to send it back on summary judgment and let the good trial judge have a hearing. Well, I don't believe that's what's necessary in this record. Well, didn't you win on partial summary judgment? Yes, we did, Your Honor. So therefore, don't you have a duty to contradict the facts and the evidence, not just stand up and give good lawyer talk about them? Don't you have to present some evidence? Well, I appreciate the compliment about the lawyers' talk, but I'm really trying to focus on the absence of evidence, Your Honor. Well, I'm trying to focus on if I give the inference to the facts in the record, how can I, simply because one gets up on summary judgment and tries to make a good argument about something, necessarily suggest that he has made a factual distinction? It seems to me one ought to present some facts. Well, the fact that they've never discovered evidence on any member of this class is a fact. Well, I don't know that it is a fact, because there are evidence in this record, and all I found in all of the decisions was some good judge's explanation about why that wouldn't be enough, or someone like a lawyer would make an explanation. But I look for the evidence. Well, you can look in vain for evidence of any contraband being discovered on any member of this class, and that's precisely what we've said over and over again. And I do want to address Your Honor's suggestion that Bell somehow, well, the particular observation I want to make about Bell is that there the strip search only occurred after a contact visit, where it can be inferred that there was an opportunity to obtain contraband. Well, as long as we're talking about Bell, let's look strictly at it. I mean, here is a situation where the people couldn't even have got the stuff from those who would have contacted them without taking off their jumpsuit and somehow putting it inside of it through a window with the contact with the people, and the Supreme Court felt like that was plenty enough to justify what the prison officials had suggested they needed to do. I think in some circumstances there may have been that type of gyration suggested, but generally those were visits that were contact visits, and you could infer from that there was opportunity, and you'd have to assume that there was close observation. In fact, in the record in Bell, they said they did not want the type of close observation of those contact visits because it would defeat the purpose of the contact visit. Well, didn't they also say in Bell, and this is quoting the Supreme Court, that the fact that there was only one of these particular things that they could cite to was very good evidence that the deterrence of what they were doing was enough to justify the prison officials doing what they did. I think that's pure speculation. Well, it wasn't mine. It was certainly in the opinion. Well, it's not evidence. I agree. But at least there was a rational basis for that policy, whereas there isn't a rational basis for this policy. Well, what exactly is the difference between a contact visit and coming in from the outside? I mean, to me, let me just start by saying that there's a lot we don't know about Bell, like what the crimes were and whether, again, it was prearrangement or postarrangement. But leaving those things aside, if those things didn't matter, what is the difference between a contact visit and coming in from the outside altogether? Well, the contact visit was planned, first of all. I'm sorry? It was planned, scheduled. It could be prearranged. The person who's in custody knows that he or she is going to be seeing somebody, and that is arranged. And if there were any interest in transferring contraband, that's a good opportunity. But this record does establish, it doesn't establish that any member of the class has done this, but it does establish that many people do smuggle things in from the outside. Yes, of course. And that gets me really to the other point I thought I should comment on that the Court has shown an interest in, and that is this question of are they intermingled? That is, are the members of this class, the most innocuous of persons who are charged with crimes not involving violence, drugs, and weapons, with no criminal history, with no other reasonable suspicion to believe they're concealing anything, are they, in fact, intermingled with a, quote, general population? And there is no evidence in the record of that, but, in fact, there's evidence that there is a classification process, and the purpose for the classification process is to separate those people who have a criminal history or a sophistication from those who have other characteristics. And one clear characteristic is that they haven't even been arraigned. They haven't had an opportunity to appear before court. They have not been considered for O.R. And it's probable that in the various jails that the city runs, they do, in fact, classify and segregate this most vulnerable population out and keep them from the ---- It would sure be helpful to know that. Pardon me? It would sure be helpful to know that. It would, and we have in the record a description of the classification process. Now, they haven't said they, in fact, take everybody who is in this class and put them separately, but they certainly, they should, and they probably do, because it only makes sense that they would take the most vulnerable, the persons who are either aged, infirmed, no prior history, they may have other medical problems, and put them someplace where they can be safely housed prior to their arraignment. But what does that have to do with whether or not it was a violation of the Constitution to script search? Well, I think that the question of institutional needs, institutional security has to be balanced against the personal private interests of the individual. That's the purpose of the Fourth Amendment, and that's the purpose that Your Honors are sitting here guarding the Constitution, as guardians of the Constitution. So is your argument that the interest of the class members outweighs the security interests of the city of San Francisco? Is that your argument? I say that the individual interests of a person for whom there's no reasonable suspicion to believe they're smuggling contraband in a bodily orifice outweighs the security interests of an institution which has a classification process that can take those people and put them someplace where they're not in contact with important criminals? Well, there was no reasonable suspicion in Belfish. In Belfish? There was no reasonable suspicion there. Well, I believe that, yes, there is reasonable suspicion to believe that when you have a contact visit. There wasn't any in the court. The court's decision didn't turn at all on that, as is reflected in both Judge Justice Powell's concurrence and Justice Marshall's dissent. Exactly, Your Honor. I agree with you. But the point is, you could also say there's no reasonable suspicion to strip search people because they have a history of drugs. But, in fact, we classify it. We have a problem. You're missing my suggestion, is that the court's jurisprudence does not turn on the individualized suspicion or individualized class-based suspicion. I think that's the way you have to read Bell, Your Honor. I think you have to recognize that what they said is there's a group of people who are having a contact visit. We have reasonable suspicion to strip search all of them. Then why would Powell have written what he did, and why would Marshall have written what he did, had either believed that the reasonable suspicion was a turning point in the court's opinion? Well, I think that we can't look at the dissent and gather from that what the majority was thinking. Well, wasn't the record that the district court had suggested there needed to be probable cause? And so addressing directly the district court on probable cause, they said something about that. But the bottom line of what they said was, we have to make a balancing decision in these instances. They didn't throw reasonable suspicion in it. They gave us four things to look at. I agree. And it was Your Honors, this Ninth Circuit, which adopted reasonable suspicion in relation to this, the minor offense. Look, you don't mean reasonable suspicion in any ordinary use of the term reasonable suspicion, i.e., individualized. There's nothing in Bell v. Woolfish that says that you have to have individualized reasonable suspicion. What you're really saying is that you can deal in classes, but it has to be reasonable, i.e., reflect the balance of Bell. So it's really – I guess what I want to know is, do you mean that you need to have individualized reasonable suspicion, or do you mean that you can have class-based reasonable determinations based on a balance? I think you can, exactly. You can what? I gave you an either-or. The latter. I think you can have class-based reasonable suspicion. And what that really means is that if you have it in class – I'd rather you didn't use the phrase, because it – it undermines it as it is ordinarily used, and it's both confusing, and in the longer run, it's inconsistent with what we mean in a Terry Strauss situation as to what we mean by reasonable suspicion. Well, that may be true, but I think I'm using it in the sense that the Court used it in Giles and Kennedy and Fuller. In your cases, you were looking at individuals, and you talked about the requirement for individual suspicion. But they said that individual suspicion can be satisfied by membership in some group, subgroup, and that would include whether you had a criminal record, what the nature of your charges were, et cetera. So that's the way I'm using it. I think it's – The plaintiff in this case, do you accept that it is your burden of proof to show substantial evidence in the record that the officials have exaggerated their response to the considerations they suggest? Yes, I do, Your Honor. So you take that as your burden? I think we have. And on summary judgment, you believe that this Court can review this record and suggest that you have met that burden? Yes, Your Honor, I do. On summary judgment, giving every inference to the City of San Francisco. I do, Your Honor. Isn't it – this is a collateral order appeal, is it not, on qualified immunity? It's not, right? Yes. In other words, it really isn't a summary judgment appeal. It's an appeal – well, we got summary judgment. Of the – on the ground that there is no qualified immunity. Yes. It's a qualified immunity appeal, and there's a special somewhat confusing standard for that, which isn't the same as ordinary summary judgment appeal. Well, that's true, Your Honor. Well, what is it? Tell us what it is if you think it's really different. Don't you have a burden of proof? And haven't you got to meet it? And haven't you got to meet it with particular evidence? Well, if we're talking about the qualified immunity, the burden is to show that there's a constitutional violation on the one hand, if we're using associated language. Well, we're right at constitutional violation. We haven't met – we haven't even gone to whether the officer should or shouldn't have known. Well, I'm just trying to respond to Your Honor's question. Let me just make sure I understand where we are procedurally, because now I'm completely confused. Okay. There was a summary judgment motion brought below by the defendants seeking a determination that they were – they had qualified immunity. Yes. And the district judge denied that motion. You're absolutely right, Your Honor. And I was confused myself. Just say yes or no, if you can. Yes. Well, let's make it all possible. Let's make sure. Okay? If I'm wrong or, you know, incomplete, just correct me. But don't embellish, please. I'm sorry. It just gets me off the track. Now I'm confused again. So you or the district judge denied their motion for summary judgment on qualified immunity. Correct. Did the district judge rule on anything else pertaining to this appeal that's subject to this appeal? That's the only thing that's subject to this appeal. The answer is no. Please. Do you know the two words, yes or no? No. Okay. No. So the status of the case below, if I understand it correctly, is there was no summary judgment granted to either party. So the parties are going forward to trial. And yes? No. There was summary judgment granted below for us on the unconstitutionality of the blanket strip search, what we call the classification search. But that's not subject to the appeal. You brought a summary judgment motion which you won after or at the time of the qualifying. Simultaneously. That's a partial summary judgment. Is that subject to this appeal? No. The only thing that's been appealed is the qualified immunity, the grant of qualified immunity. So if the district judge was wrong on the granting you summary judgment, that's not something that we can correct here, right? Yes or no? Correct, except that if you get to the ‑‑ if you use the Saucier v. Katz analysis and you conclude that there's no constitutional violation, then that would essentially reverse the grant of summary judgment. But if we're not ruling on that, then it would go back to the district court, and then the district court would find that there was qualified immunity and rule against you, but that would be in the district court. It has the effect, but it's not a ruling on our part. That's correct. I mean, it would pretermit what the district judge did. Right. If we were to rule that they have qualified immunity, it wouldn't matter what else the district judge ruled, because that would be the end of the case. It would not be the end of the case. It would only dismiss the sheriff as a defendant. In my understanding ‑‑ Could someone else say? Wait. So what I don't understand is why you were answering Judge Smith's questions the way you were answering them, because the way you were answering the questions would lead one to believe that the city of San Francisco was the nonmoving party and, therefore, all the inferences should be drawn in their favor, when, in fact, it's the exact opposite, since they were the moving party and you're the nonmoving party, and so all the inferences should be drawn in your favor, and yet you were answering all of Judge Smith's questions. I don't understand exactly where the miscomprehension of the standards for summary judgment on qualified immunity has crept into this, but it has. You're right, Your Honor. And I was assuming that he was getting us back to essentially an appeal of the district court grant of the summary judgment, a partial summary judgment on that other matter. Well, I ‑‑ again, I just tried to understand where we stood, and if ‑‑ I mean, of course, if a member of the panel asked you a question, you should answer them, but your position is that the ‑‑ just to understand what your position is, is that that aspect of the district judge's ruling is not before us. That's correct. And any ‑‑ But it has to be, because it's a two‑pronged test. So we have got to decide both constitutionality and if ‑‑ whether the law was clearly established as of 2004, right? Well, you don't have to, Your Honor. I know. Under Pearson, we don't have to, but we can decide to do that. Yes. And if we do decide to do it, the constitutionality of the policy is squarely before us, right? Right. Okay. But the record question, as I understand it, in a qualified immunity appeal, it does not get into the question of whether there is a conflict in the facts, but rather assumes the facts in favor of the plaintiff and then asks whether there's qualified immunity. There's a case called Barron's, as I recall, and another one called Jones or something. I think it is. And Jeffers is our case on that. And it's a different inquiry, because all we're trying to figure out is whether there's, as a matter of law, qualified immunity. And so you did confuse things by really not focusing on where we are. Well, I'm sorry for that, Your Honor. But I agree with your statement of where we are. And I certainly agree that there is no qualified immunity, and I think that's been established in this, in the circuit, that the law is clear, has been clear that mere intermingling or the decision to place a person in the general population does not itself give the basis for a question. Let me ask you the same question Judge Smith asked you, and that is who bears or somewhat different, but going to the same point, let me phrase it somewhat differently. Who, in your view, bears the burden of proof on whatever factual predicates there are for the determination of whether the policy was unconstitutional? Who bears the burden of proof on that? Since the appellants are the ones who are challenging the denial of their motion for summary judgment on qualified immunity, it would be they who have that burden. Okay. And is your position they have met that burden? They have not met that burden. They have not met the burden because they can't establish that this is any – the situation in San Francisco is in any way significantly different from the cases that the Court has previously considered? And I mentioned just a few, but certainly Ward, Kennedy, Giles, Fuller, Thompson. All of which were quite different because in each there was a pretrial or prearrangement arrestee on a minor charge who was to post bail, and the strip search occurred before the bail determination or release, and none of them was going to be placed in general population, and there was no justification that wasn't exaggerated. So this is a different case. I don't believe so, Your Honor. I think that even in Giles, which was admittedly a small jail in Boonville, Idaho, the person was strip searched before being placed in the general population. That's what the – that's what the rule was. That's what the rationale was. Well, they had a throwaway line, but that wasn't – that was unreasoned and not reflective of the fact situation. Well, I think the same thing. You say it's a throwaway line, but I think it's rather significant because the incidence of smuggling in Giles proportionally was ten times that, that the record establishes in the San Francisco jail. So clearly, if it wasn't justification to strip search a person going into that general population, you can't use that argument to justify strip searching a person going into the general population in San Francisco County Jail. And we are talking about people – it's a weighing – there's a balancing test. We're talking about protecting persons who are subject to the most humiliating indignity, to be required to expose their personal private areas for close inspection by persons that they have no connection to. I mean, the courts have always just been just shocked by this. And it even gave the Supreme Court the most pause when they considered it. And they only justified strip search policy in that case because of the specific circumstances of the MCC, the Metropolitan Correction Center. Can I ask a question about – so did the City and County of San Francisco, it did change its policy. Did it change it to conform to Judge Breyer's ruling? Yes, Your Honor. So do – so we have no evidence now of any, like, post-ruling problems that may have occurred as a result of the change in policy? Exactly. There is no post-problem indication that anybody in this class smuggled items in that later caused any kind of difficulty. And that evidence that's the subject of the motion for judicial notice in the Companion case, how does that relate to? Well, that – that – the Yorkie case also had no instances of anybody in this class found to have been smuggling anything into the jail. And that record was examined closely by the three-judge panel. If you go back and have a trial, which is a possibility, would the evidence regarding what's happened since under the new policy be admissible evidence? I don't know the answer to that question. In terms of the constitutionality of the policy. I mean, it would be certainly worth knowing for somebody who wanted to tell whether this really made a difference. Pardon me? It would be worth knowing in a logical sense. Yes, it would. But we would be talking about people who had been strip-searched under the old policy. So I'm not sure that – Well, couldn't it bear on the reasonableness of the city's concern? If there were continued – if there were more problems under this new system, it could suggest that their policy was reasonable. If there were none, it would suggest that your response is reasonable. But Marshall's summary judgment has already been granted on that. So that would not be an issue that would be – continue to be litigated below. But if it went back, there could still be a trial, at least just for qualified immunity, no? If we were to approve – if we were to not reverse the qualified immunity ruling up until now, what would happen next? Well, there are some matters as to which there will be a contested trial. And ultimately, there will be a contested trial on damages. But those are – those are the matters. There are certain issues relating to the strip-search and whether placement in a strip-search – I'm sorry, safety cell – whether placement in a safety cell justifies a strip-search. There are other questions about whether some of these searches that were done were, in fact, reasonable suspicion searches. So there are many issues that are reserved for trial. But just – Including, I gather, a second ruling on qualified immunity following full development of a record. I'm sorry, Your Honor. There would be a second ruling on qualified immunity after a trial. I don't – or if there's an opportunity for that. You don't think so because you've already got summary judgment on that. Well, their motion for summary judgment was denied, and I think that it – Well, it was denied in part. It was denied only as to the strip-search. It was granted in part on the safety cell and on the criminal history. One was found not to be unconstitutional. The other was found not to be clearly established. So it was partially – That's resolved. The qualified immunity issue is resolved. Well, no, it can be re-explored. If facts are developed, that would indicate – I mean, right now you have all the inferences in your favor on qualified immunity analysis because we take your allegations as true and what the district court said is true. If the allegations don't pan out, then the district court has the opportunity to revisit that. That's what's happening in your case, that we're denying qualified immunity in summary judgment because they're factual issues. Now, if factual issues cut the other way, the district court can always revisit qualified immunity later. Right? That's correct. Yes, Your Honor. But was the summary judgment here with regard to qualified immunity denied because there were factual issues? Or weren't you, in fact, granted summary judgment on the constitutionality? We were granted summary judgment. Well – So that issue isn't technically in front of us, and yet it's exactly the same issue from the other side. I think that is correct, Your Honor. Okay. Well, I think that what we're asking is that you continue your time-tested line of cases where you indicated and confirmed that it was the guiding principle that reasonable suspicion be required before a strip search of somebody, a minor offender, prior to arraignment. And that is the balance that you've enunciated quite clearly. And I don't think that that balance should be upset in this case because the city attorney alleges that they have a significant contraband smuggling problem. In fact, they were strip searching members of this class for the four years that they were counting contraband. So clearly, the strip search of this innocuous group of people was not the source of that contraband, especially since they didn't find any on the people in this class. And if you think about it, from the most vulnerable people who were being strip searched who were charged with parking violations or walking their dogs in the park or some neighbor made a citizen's arrest. But we're being told that those people would cite out and they would not, in fact, go into the population. So what's the truth of the matter? That's not necessarily true. You actually have, in some instances, political demonstrators who refuse to pay bail who, for one reason or another, are not citable either because they need to. What about the people walking their dogs in the park? Are they – is there any chance they're going to end up in the general population? Yes. We actually ended up – we have such a case, Your Honor, where because there was a warrant out in another county for an old parking ticket which had been paid, the woman could not be released. She was not subject to being cited out. And she was strip searched, not once but twice. And it was just because she had her dog off of a leash in a park. And believe me, that woman's life has changed as a result of being so humiliated. So that's the important role that Your Honors have to play. And it's a very – the county has a very low standard. They could strip search anybody on reasonable suspicion. Yes, Your Honor. Time is up. Thank you. Thank you. Good morning, Your Honor. Danny Chu appearing for the appellants and defendants. What I'd like to start with first is the question regarding the issue of what's happened after the jail has changed its policy. And it really illustrates why you should get some student bail in this case. I'm not sure that you – I mean, there's no facts on that. I don't know how you can – I mean, I know I asked the question because I wanted to know if there was anything in the record on that. Yeah, well, let me explain. First of all, there is anecdotal evidence, which is evidence by the death that happened soon after. I don't think you should – that you should be arguing. I think that's completely beyond. We don't even have – is there anything in front of us about any death? Yeah, there is, actually. What? It's an excerpt from records 1058 to 1059. And that's post the change? Yes, it is. 1058 to 1059. There was an inmate who died from a cocaine overdose 11 days before the inmate had actually been strip searched. They have no idea how the cocaine got to him. They have no idea how he got a cocaine overdose. And that was after the policy was changed on January 21st, 2004. So there's at least anecdotal evidence that there has been a serious consequence from the policy. Well, not really. I mean, there's absolutely no inference you can draw from that. For all we know, there could have been consent. There could have been contact visits. There could have been, you know, gazillion explanations for that. Well, Your Honor, that's certainly true, but I think – And it was 11 days afterwards. It was 11 days after that particular inmate had been strip searched. Right. So – and they didn't find it on him at the time of the strip search. And then 11 days later, he dies of a drug overdose. How does that say anything about the policy? Well, it has to do with the fact that with the change in policy, they weren't able to – You're saying somebody who wasn't strip searched must have brought it in, is what you're saying. Well, he was strip searched, but somebody who wasn't strip searched – We don't know anything about how the cocaine got there. No, you're absolutely right, Your Honor. And my only point is that there's at least anecdotal evidence that there's an effect from the change in the policy. But regardless of that, the whole point is that there is no way for the city to ever prove at that point that the previous policy was more effective. Once the contraband gets into the jails, the city has no way of determining where that contraband came from. So you kind of leave the city in a catch-22 at that point. And that's exactly why the U.S. Supreme Court in Bell made the test a reasonableness test. They didn't require this level of proof to justify the whole strip search policy. Are people searched after they – they're transported from Jail 9 to other locations based on their classification. When they get there, are they searched? They're pat-down searched. But they're not strip searched. They're not strip searched, yes. That's right. They're put in a holding cell, then they're booked, and then they're put in another holding cell where they're first determined whether, in fact, they're charged with an offense involving drug use. So they're strip searched before they go into a vehicle that transports them somewhere else and so on. I'm sorry. Could you repeat that? So they're strip searched before they go into a vehicle that transports them someplace else. Yes, that's correct. And then they're not strip searched when they get there. That's correct. So you're asking us to overrule Giles and Ward and Kennedy and Way? Well, Your Honor, I don't think the court has to overrule those cases in order to decide for us. This case is very different from those cases. The record is quite different. There's a huge evidence of a contraband smuggling problem. There's also evidence that many of the arrestees attempt to smuggle contraband, often in their bodily orifices in a way that can only be detected through a visual strip search. There's also evidence in the record of many instances where arrestees who are not charged with drugs, weapons, or violence offenses attempted to smuggle drugs or weapons into the jail, oftentimes in their bodily orifices. And as my colleague, Mr. Bonta, pointed out, there's at least one incident where there was an arrestee who wasn't charged with a drug, weapons, or violence offense. Counsel, my question to you is are you asking us to overrule those cases? And your answer was we don't need to, but what's your position? Well, our position is that in the results in those cases, none of them have to be overruled because our case is factually distinguishable about those. But to the extent that those cases say that you always need a reasonable, an individualized reasonable suspicion to visually strip search an arrestee, that aspect of the decisions would have to be overruled. So that's what our position is there. But I want to take it back to the reasonableness test. And what Bell v. Wolfish says is that in the absence of substantial evidence that the sheriff's response is exaggerated, the Court should defer to the expertise of the sheriff. And in this case — This argument would support a body cavity search as well, right? Absolutely, Your Honor. And here — I mean, there's really no difference. The very same justification would say they can do a body cavity search on everybody who gets — Yeah, absolutely, Your Honor. And that's what — I'm not sure I understand. You mean a body cavity search meaning one with — where you touch people?  I'm sorry, Your Honor. To clarify, a visual body cavity search — Let me make sure you understand my question. Body cavity search is the kind where you use a rubber glove. No, that's not what I — I apologize, then. So do you understand my question? I do. The policy that would be justified by our thing is a search that's no more intrusive than the search that was allowed in Bell, which was a visual — Well, explain to me why, if you were saying that the city had adopted a body cavity search policy. Same reasons. Say, you know, people die. We know that stuff is smuggled in. There's lots of room in bodily cavities to carry contraband. We know there are lots of instances where people have done that. We want to be safe. You know, people carry drugs. People carry scissors and knives and all sorts of things. Why wouldn't that be equally — this argument. Why would this argument prevail in a body cavity search policy — to sustain a body cavity search policy? Well, Your Honor, I think it has to do with the need. What's clear from this record is that a visual body cavity search is sufficient to detect much of the drugs or weapons that are being smuggled into the jails or attempted to be smuggled into the jails by arrestees who have bodily orifices. There's certainly no evidence in the record that a more intrusive search is necessary to detect that drugs or weapons, at least on this record. So based on the need that we've demonstrated, we've certainly demonstrated the need for a visual body cavity search. Now, I think that you could argue certainly that maybe a more intrusive body cavity search is necessary, but you don't have to go that far here. And certainly Bell makes it clear that one incident is sufficient to justify a visual body cavity search, and that's as far as you need to go in this case. Can I ask one last question? Sure. What do we know from the record about the classification process and where these people in this class actually end up? I mean, or put another way, why do they end up in a — if they end up in a general population with people who are not in that class, why is that? Or is it? Do we know what it is? Well, the record is not 100 percent clear on that. What the record makes clear is that people are classified based on risk factors. Risk factors include age, medical condition, criminal history, and charges. And they're classified based on that multifactored approach, and they're classified in different things and then they're grouped together. It's not 100 percent clear what the correlation is between who's strip searched or why they're strip searched and where they're going to be classified. And that's the very reason why — The prearrangement condition doesn't matter? Pardon, Your Honor? The prearrangement status does not matter? No, Your Honor. Well, I mean, it's a factor that's considered. It's a factor. But it's one of many. Okay. Thank you. Our case is filed. You have 10 minutes. We are adjourned.
judges: Kozinski, Rymer, Thomas, Graber, Wardlaw